My name is Hala Sandridge, and I represent Lee County. With me today is Victoria Oguntuye, also from our firm. The critical issue that this court must address is whether Florida's Public Whistleblower Act requires discharged employees to establish causation through proof that the decision maker terminated the employee because he or she disclosed gross mismanagement. The plaintiff pled and argued below that . . . I'll tell you what the main issue that concerns me. I don't want to interrupt your order necessarily because you didn't identify it. I want to talk about Ms. Noe's damages. I don't know to what extent you had that on your prepared sheet, but I'd like to hear about that before you finish. Sure, and would you like me to . . . It's your call as to what order you want to do it in. I'll go ahead and make sure that I leave time to deal with that, Your Honor. So the plaintiff pled and argued below that causation under the . . . I call it the PWA, the Public Whistleblower Act, is satisfied by proof that the decision maker terminated the employee for participation in an audit. However, the PWA requires more. Causation relates to termination for making disclosures, not termination for participation. The plaintiffs misunderstood the PWA and their burden under it. It was a hell of a coincidence, wasn't it? Seriously, that's what the jury looked at. That's what I'm looking at. You got five people who spoke to the auditors, and just coincidence out of coincidence, four of them were fired. The only one who wasn't a fired was a good friend of the decision maker. You know, you fire one who talked to one out of five, okay, odds are you're going to fire one out of five if you just fire non-discriminatorily. Two, that's a coincidence. Three, that's a hell of a coincidence. Four, that's compelling proof. I mean, come on. Why could a reasonable jury not look at that and say, of course they fired them because they talked to the auditors? So, I am sure that's exactly what happened in this case. It's what would have happened had I been on the jury. And I would say that if you made that decision based solely on that inference, that is not an inference. It's not an inference. It's a fact. It is a fact, but here is what... I mean, couldn't your client have fired somebody else just to make it look good? Come on. Sawyer testified, did he not, that he didn't know that they had participated in the audit? Is that right? He testified that he did not know everybody who participated in the audit. Couldn't a jury have disbelieved that? And we're not appealing that issue. No, but if they disbelieved that, then that's the end of the matter too, right? No, Your Honor. And he knew? That is exactly our point. That is exactly our point. That is what the plaintiff argued. That is what the plaintiff tried. And that is not what the PWA requires. And let me go to the PWA because I think this is very important and this has been misunderstood. Before you go, I thought Sawyer testified at first. He didn't know who talked to him. Then he changed his testimony and said, I assume everybody talked to him. And then he changed his testimony a third and then a fourth time. Am I wrong about that? I think it's a little bit different than that. He didn't say it exactly like that, but I think at first he said that he did not know. And later he said, well, I think I may have known some of them. No, no. Well, I assume they all did. That's what he said. And then, well, I think I knew more coincidences with his recollection. And the jury can reasonably infer, oh, he knew exactly. He saw his demeanor. And you're not challenging that. Yes, you are. Let me make it clear. You are challenging that. If the jury could find that he lied when he said, I didn't know who talked to the auditors. If the jury could find he knew who talked to the auditors, and then he fires four out of five, saving only his good friend, they don't have to prove anything else. They do, Your Honor. And let me go back to the statute again. So the statute, it's entitled Adverse Action Against Employee for Disclosing Information. The PWA, unlike some of the other retaliation statutes, is not for discharging for participating in an audit. The prohibited activity, the actions prohibited are defined. I know where you're going with this. The audit report came out and was very critical, was it not? It was. And these people talked to the auditors. They did. And then the audit report that their participation led to was very critical. What kind of, I'm sorry, why does it take a genius to figure out that if the audit report that resulted from them talking to them was very critical, they must have said very critical things? So here is the way they tried the case, and why our severance motion, which was denied, was important. What they collectively did is they lumped this all together as though you could show that simply because. . . They were fired all together, weren't they? No. No. They were fired separately. One was fired because of a reorganization, and two was. . . I'm sorry, the other. One was terminated because of a downsizing, and the other two were terminated a month later because of reorganization. In the history of the department, had there ever been a downsizing before? I'm not sure the record shows that. If it does, I can't answer that question. The question is not the because word is loaded here. They were fired because of a reorganization. They were fired because of a downsizing. Two things.  And number two, even if they were fired as part of a reorganization or as part of the downsizing, the question is were they selected because of their participation in that audit in which they made critical remarks. Your Honor, that's not what we believe the issue is. The issue is whether they were terminated, and I'm going to go back to the statute. It says that the action prohibited is not terminating someone because they participated in an audit. It is an agency or independent contractor shall not dismiss, and I'm paraphrasing, an employee for disclosing information of mismanagement. Where else would they have gotten the critical information, the auditors? So there's no question about this. The evidence showed, and all of the plaintiffs admitted, that the critical information could have come from other employees other than themselves or public information. And so what, and by the way. But it also could have come from them. It could have. And they didn't fire other employees. There are other employees that were fired within the county, not I think in the EDO. Right, the EDO. Correct. So it was just blind luck that the decision maker happened to fire the people who actually gave the derogatory information. I don't think it was blind luck. I think that they were all part of this dysfunctional organization. Only dysfunctional people talk to auditors. And I'm not suggesting that. What I'm saying is that I think that the decision maker, and I think he testified to this, wanted to clean house. I don't think there's any question about that. That's great, and that's what you argued to the jury. And you didn't object to any of the jury instructions relating to this issue of causation, as I recall, did you? So, well, here's what happened with the jury instructions. No, did you object to any of the jury instructions on this issue of causation? So, yes and no. So the way the jury instructions worked in this case is we provided jury instructions and they provided jury instructions. And in ours, we did not specifically ask for the language that the judge gave, which the plaintiffs asked for. They asked for the language. Did you object to the plaintiff's language? So, no, because what happened is we gave the information and the judge didn't have, I thought this was an unusual procedure, a charge conference. And so the way he let us know what instruction he was choosing. You could have objected after the instructions were given. Yes. If you had no opportunity to do so before. So the jury was instructed without objection on the causation element. And there's all these facts you argue one way. There's all the facts the plaintiffs argue the other way. And the jury, the doctors of doubt, decided which way the doubt lay and resolved it according to the jury instructions. Yes, and again, I do not disagree that that's what they did, but here is the problem. And then I'd like to turn to the damages. You're frittering it away. And the reason I say what I say is because this jury couldn't have found what it did because they didn't try the case that they needed to try. I'd like to move to the damages issue. Please do. So NOE requested a specific element of damages that we asked be remitted. We're up on that. But you didn't ask for a 50A on it. You didn't ask for a 50B on it. You raised it for the first time in the renewed 50B after verdict. We've said you can't inject new issues at that time. Then you raised it in the remittiture, and we've said you can't do that for the first time. So, again, we did raise it. We raised it when we did. Belatedly. And belatedly. But what it shows is that... Has your opponent complained that it was belated? No. No one's ever complained it was belated. And what it showed is that $200,000 was awarded to NOE based upon her testimony of future action she would have taken, and there's no evidence. Well, she had actually taken the action of filling out the papers according to the unrefuted testimony. Sure, and that's an easy one to take. But what's more difficult is paying, coming up with and paying $60,000 in the future. And she was kept on for some period to allow her to do this, right? And she didn't do it. And she didn't do it. And so our point... Was she told that she was being kept on to allow her to buy that time? Yes. Is the evidence in the record clear that she could have bought it during that period? It was specifically the reason she was kept, and she didn't do it. When you tell me it was specifically the reason she was kept, that doesn't answer my question. Is the record evidence show that she had been approved and could have purchased it during that two-month period? She doesn't contend otherwise. I don't think that anyone put any evidence into the contrary. I do know that that was the reason that she was kept. She asked for it, and she could have done it, and there's nothing to show that she couldn't do it. She just didn't do it. I can see my time is up. Thank you. Ms. Kennedy, would you start with that issue to keep us on track, please? Certainly, Your Honor. With regard to the third issue brought up in the brief, Ms. Noe's retirement benefits, just to clarify, what is in the record, in fact, is a statement by Mr. Saylor that she had asked to stay on a bit longer because, quote, she was working on something retirement-related, and that's in the record 149, page 88. There is nothing that she could have, specifically that I'm aware of, stating that she had the opportunity to do this. And, in fact, it's actually contrary. What was testified to was Ms. Noe testified that she was in the process of buying back five years of service. She explained how she had been a government employee for 17 years, and that she was in the process of getting them to sign off on my years of service with them. She said, I submitted that form, finally, to the State of Florida, and I wanted to buy back five years, so that would have given me approximately 31 years in the retirement system. She submitted the forms. She just didn't pay the money. Your Honor, that's not clear either. What is clear from her testimony is that she submitted the forms, and then she was told, no, you can't do this because you are no longer a government employee. Or are you saying she was never given the opportunity to submit the money? That is my understanding of the facts of this case, Your Honor. Yes, in the testimony. Let me ask you this. I got the testimony. It's barely a full transcript page of what the jury heard. What other evidence and where is it in the record about her being kept on in order to make that payment and about whether she could have made the paperwork had been approved before she was finally let go? Where is that other evidence? It isn't. There is nothing in the record other than Mr. Saylor testifying that she was working on something work-related to indicate that she was allowed to stay on for that purpose. And the inference that's being made is that she was allowed to stay on for that purpose, and she failed to do so. I do not believe that is in the record. What is in the record is her testimony that when she's discussing her damages, she explains, I was going to do this. I was in the process of doing this. I was then told I could not do it because I was terminated. This is what that benefit would have been to me. Now, there was no process. She said $150,000 to $200,000 doesn't identify how much it would have cost. She did not specifically identify how much it would have cost. However, I will note that this testimony, I was going to do this. I was in the process of doing it, which does not make it speculative to the point where it was improper. She said, this is the benefit I could have gotten as an employee, government employee. This is how long I've been working. This is what it would have been. I was in the process of doing it. The speculation, though, is it would have cost something, and the amount she testifies to is $150,000 to $200,000. It would have been the retirement benefit. Judge Pryor, there was never any cross-examination as to that point. Certainly, if there was an issue with, well, can you afford that, then that's something that should have been brought up on cross-examination. But the burden on you to prove damages. That is correct, Your Honor. When you say I could have bought back some time, she's talking about five years of the EPA, and you don't say how much it would have cost, how have you proven your net damages? I believe you have, Your Honor, because the presumption is, or she's saying I would have done this. I was in the process of doing this. In that is, you can't do it if you can't afford to do it. I'm talking about the amount of the damages. Suppose she was awash in cash. We still don't know how much it would have cost to buy back those years. They're not free, and you don't get them for $1 a year. Correct, but she also didn't testify that part of that $200,000 she was trying to recoup back the $60,000 that it would have cost her to buy it. She was saying if I had purchased this, the result would have been an extra $150,000 to $200,000 in retirement. No, she doesn't say extra. This is what she actually said. On the record, you're talking about page 40 of 208, line 19. I wanted to buy back five years, so that would give me approximately 31 years of the Florida retirement system. That would have amounted to probably about an additional $150,000 to $200,000 to my retirement. It sounds like it would have increased her retirement $150,000 to $200,000. Putting aside the fact that's a $50,000 gap in specification, she still doesn't say how much it would have cost her to add that to her retirement. They don't deduct it, at least in the state I'm familiar with, they don't deduct it from your future retirement. You buy it back now. Is that not the way Florida does it? We don't know how Florida does it. That's what we have, Your Honor. Correct. That is my understanding. How are you supposed to calculate the amount of net damages if you don't know how much it would have cost her to get an extra $150,000 to $200,000 in retirement dollars? Well, I will say that it is easily calculated. You can calculate it based on the statute. Counsel did it in the brief where she said, under the statute, it's this amount, it's this percentage, and it's easy to calculate. The jury, I don't believe in the jury instructions, was given that information, but certainly they were aware. She said, I'm buying back. They knew that there was an element of something that she was having to buy for this. Well, they gave the $200,000, basically. They gave the $200,000 that she said. Which we know is inaccurate because it doesn't reflect the amount it would have cost her. But it reflects the amount that she would have had in retirement benefits had she not been terminated. Yes, but it doesn't reflect the amount it would have cost her. Let's say it would have cost her, take an extreme hypothetical, it would have cost her $201,000. She's not entitled to any damage award, is she? In that circumstance, no. Okay. If it would have cost her $50,000, and it would have increased over the life expectancy of the retirement, $200,000. She's not entitled to $200,000, is she? She's entitled to $150,000, but she got $200,000. She got it cost free is what it amounts to through the jury, and that's just error. Again, she discussed that she had to buy it back. It was a $150,000 to $200,000. It was what she estimated it would cost in her retirement. Tell me this. Let's say it's error, okay, that we've got to do something about. What would you say if you've lost the point that it's error? What do you think we have to do then? If it's error, then I think that the proper thing would be that the jury awarded $200,000 and . . . Do we vacate it and remand it to the district court to redo it? I don't think the whole thing would be redone. I think if anything, there would maybe just be a remitter for that amount that she would have had to pay. Are we supposed to determine that amount? Well, counsel determined it. You have no quarrel with your opponent's calculation of it? It's a statutory framework, Your Honor. I mean it's based on statute, so it's . . . Yeah, except it's got that interest. It's a percentage. It's a percentage, so I mean it's a mathematical . . . Twelve grand a year I get. Right. I'm not sure how we calculate the interest, which is also added to the cost, is it not? Yes, yes. We could do what appellate courts have been doing since the beginning and just remand it and instruct the district court to figure that out. But I think that if there is a remand, I guess my point was just that it should be limited to . . . Because, I mean, there has been . . . They're seeking kind of a whole judgment in their favor and a whole . . . And I think that if this limited issue needs to be remanded, then it is not even, I would argue, that . . . Because, again, the point is that she testified, I would have gained this benefit. I understand the court's concern that that wasn't offset by the cost that she would have had to expend to purchase it. But that does not negate the fact that the argument has been she gets nothing because . . . Or remanditure. I mean their argument is trial or remanditure. Correct, but their initial argument has been that this element of damage, this $200,000 . . . I understand. That's their initial argument. Let's say they lose on that, okay? So, what I'm saying is if there was an issue with the lack of accountability for the amount that it would have cost to purchase this . . . Then, I think that is what the remanditor has to be limited to. Because, again, there was no cross-examination as to whether this was a valid element of damage. I think you've answered my question. That's what you think how it ought to be handled. Yes, Your Honor. Briefly, to kind of step back if that's kind of resolved that third issue. We are here primarily with regard to the first issue because these three Lee County employees were asked to participate in an audit. An audit that was extremely critical of the Economic Development Office. The whistleblower statute is intended to protect employees, just like Ms. Noe, Mr. Brock, and Ms. Schuman. They participated. The testimony was that, in fact, Mr. Saylor, as Judge Carnes pointed out, initially was, well, I didn't know. That's why there was significant argument below about his knowledge. Because, he was saying he didn't know. So, of course, that was something that had to be established. So, there was significant testimony and argument on the summary judgment hearings and things like that to establish, yes, Saylor knew. Because he was saying he didn't know. Well, then we get to trial, and there's sort of this shifting of sands. And, ultimately, it's, well, yes, I did know that they participated. So, then the causation question shifts and becomes, as the county has stated, well, what does he have to know? And the notion that Mr. Saylor had to know specifically, you disclosed this specific piece of information, I mean, is not supported by the case law and would have a devastating chilling effect on the Whistleblower Act. The courts have stated repeatedly that the intention of the act is for it to be applied broadly and to provide protection to employees. Here we have the standard, even in cases cited by the county, is that the plaintiff must generally show that the decision maker was aware of the protected activity. Now, yes, under the statute, the protected activity is disclosing some evidence of misfeasance or malfeasance or things of that nature. There is no doubt, in looking at this audit report, which was given to the jury, and in hearing eight days' worth of testimony, that it cannot be said that a reasonable juror could not find that Ms. Noe, Mr. Brock, and Ms. Schuman were terminated because they disclosed evidence of misfeasance and malfeasance and gross impropriety within the EEO. There, in fact, is testimony that we've cited in our brief where Ms. Schuman, for example, specifically testifies that she was the only one who knew about the fiscals. That was what she did. And she points to items in the audit that are things that she specifically talked about. Are there some items that throughout all of their testimony they said, well, yeah, anybody maybe would have known that? Sure. But that doesn't negate the fact that there was specific items that they each had personal knowledge of. You have, for example, Mr. Saylor testifying that with regard to one of the issues that was in the audit was the fact that there was a loan given to Jennifer Burke's husband. The marketing director, former marketing director was Jennifer Burke. And in his testimony, Mr. Saylor states, well, yeah, I realize that it happened, and that was something, he states that that was something that he thought was not well known. Well, you know, we really weren't, oh, that was something that was not well known by everyone, and that only certain people were aware of that information. Well, now, certainly he knows. Who would those certain people be? He knows who those certain people would be, yes. And as Judge Carnes pointed out, you have six people that participated in this audit. One was a friend of the decision-maker. Five were terminated. Certainly, is that enough? Is the inference, is that mere inference enough? No, probably not. But when you have that combined with the audit itself, the testimony from each of the plaintiffs as to what they disclosed, what information they had knowledge of, again, the audit itself states, we interviewed six employees, the auditor interviewed six employees who expressed concern with organizational changes, and then it goes on to say discuss during the interviews included. And then it goes on to laundry list 12 items. Now, again, this audit report was part of the record, would have gone to the jury, so it would have been part of the judge's consideration of the Rule 50 motion. These things are, you know. There had been fiscal problems at the county before, right? And when they had those problems before, they didn't resolve them by reorganization and layoff plan, right? You are correct, Judge Pryor, and I'm glad you got to that point because something I wanted to mention was that, in fact, just to answer Judge Dubina's question earlier, in fact, Ms. Noh testified, and this is at docket 144, page 157. She specifically testified that in 23 years that she had worked for Lee County and worked in the EDO, that they had never had a reorganization, and that despite fiscal problems. If they had these kind of problems, they might cut travel. There are a lot of things that they would do, but not this. That is correct, and, in fact, Eileen Shuman testified that she often was the one responsible for sort of doing a preliminary budget cut when these things came about, and that, in fact, in this particular year, she had done that, as she always had. She had found approximately $75,000 worth of reductions, and as she testified, oddly, Mr. Moore came in and said, no, no, stop what you're doing. I'm going to do it, and she explained that that was extremely out of the ordinary, and, again, one of the factors that can be looked at for pretext, which a lot of what we've been discussing kind of goes to, is, in fact, when you're doing something sort of out of what is normal. So, you know, the jury certainly, there was enough evidence to go to the jury to consider whether this claimed reorganization was pretext based on what we've discussed and the fact that, in fact, they hired additional people. Thank you. Thank you. Ms. Oguntoya? Thank you. Do we have a change in the? Yes, we do, Your Honor. Thank you. I practiced pronouncing that name. The question is, did he get it right? Thank you. Thank you, Your Honor. What you just heard was the argument that they didn't make to the jury, and this is our point. Our point is, throughout this entire case, they believed that they had to show participation. Our argument is they had to show disclosure, and what they are asking this court to do is to basically act as the jury and say that the jury could have found this on this evidence, and our point is that no authority permits a court to affirm a jury verdict on evidence that the jury was never asked to consider on an element that they never asked the jury to decide. And with respect to the damages issue, I wanted to refer this court to the case that I cited in our brief, Brow v. Imperial-Sterling. And our point at the beginning is that damages cannot stand because there was a failure of proof. So the entire damage award, remember, this was an issue that went to the jury. The jury had to look at the evidence and decide whether or not she was entitled to these retirement benefits, and our point is that the plaintiff just, no, he didn't put in the evidence. It was purely speculative evidence. Which is what the 50A and 50B procedures are designed to do, and you didn't use it. Whether they complained about that or not, I'm complaining about it, because if you had raised it 50A, for example, that would have given them the opportunity and the trial judge the discretion to allow them to supply the missing element, and you didn't do it. Instead, you wait until they have the jury's discharge and they have no more opportunity to do that, and then you raise it in a new trial in a remediator motion. Remediator can be taken care of, but to say that they lose the entire claim because you didn't, in a timely fashion, raise the problem when you had the procedural power to do so is, I think, a step too far. I hear what you're saying, Your Honor, and I believe that the difference here is she is entitled to some damages. We're just challenging a portion of it. And so we did bring this up once the jury verdict came in. Oh, I'm sorry. You're challenging the entire 200. You're not just challenging a portion of the 200 portion of the larger claim? No. She received other damages, I believed. And so those damages related to her term, the only portion that we're challenging is the retirement. And so we had no basis, I believe, to move for a directed verdict during their case in chief because she was entitled to some damages. I think the question was— If she didn't prove that component of the damages, you certainly had the procedural basis or vehicle for asking the jury to exclude that element and direct the jury not to consider it. Yes. Counsel got up in closing argument and said that she had testified there was $100,000 in damages, which the jury realized was his slip-up mistake, and you didn't object to that. I think what I'm trying to do is just make sure that the court knows that we have two arguments. Number one is that she didn't prove her damages at all, and number two, that there is an amount that can be set off, whatever it might be, that she did not completely prove the exact amount. I understand. Thank you. Thank you. All right, we'll take that case under submission with the others and stand in recess until tomorrow morning. All rise.